UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CHELSEY EASTEP, as surviving spouse and next of kin of LANDON DWAYNE EASTEP, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 3:22-cv-00721 ) |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, et al., | ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Pending before the Court are five Motions to Dismiss Plaintiff's Second Amended Complaint (Doc. No. 72). The first (Doc. No. 103) was filed by Metropolitan Nashville Police Department Officers Steven Carrick, Sean Williams, Brian Murphy, Edin Plancic, Justin Pinkelton, and James Kidd (collectively "Metro Officers"). The second (Doc. No. 105) was filed by the Metropolitan Government of Nashville and Davidson County ("Metro"). The third (Doc. No. 107) was filed by Tennessee Highway Patrol Troopers Reggie Edge, Jr. and Charles Achinger (collectively, "THP Officers"). The fourth (Doc. No. 109) was filed by the City of Mt. Juliet, Tennessee ("Mt. Juliet"). The fifth (Doc. No. 111) was filed by Mt. Juliet Police Department Officer Fabjan Llukaj. All five Motions have been fully briefed, (Doc. Nos. 104, 106, 108, 110, 112, 121–30, 141–146), and are now ripe for review. For the following reasons, the Court will grant Metro and Mt. Juliet's Motions to Dismiss (Doc. Nos. 105, 107) and grant in part and deny in part Metro Officers', THP Officers', and Llukaj's Motions to Dismiss (Doc. Nos. 103, 107, 111).

## ALLEGED FACTS AND BACKGROUND

The Court relies on the relevant factual allegations from the Second Amended Complaint (Doc. No. 72) and assumes they are true for purposes of ruling on the instant motions. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

At about 2:00 p.m. on January 27, 2022, Landon Eastep sat on the right shoulder of Interstate 65 Northbound near mile marker 76. (Doc. No. 72 ¶ 21). Tennessee Highway Patrol officer Reggie Edge, Jr. approached Eastep and began speaking to him. (Id. ¶ 22). Eastep answered Edge's questions and, when requested, handed Edge his driver's license. (Id.). Edge returned to his vehicle with Eastep's license and remained there for several minutes. (Id.). During this time, Eastep took out an electronic cigarette and took several draws, exhaling large clouds of white smoke. (Id.). When Edge reapproached him, Eastep placed the electronic cigarette back into his jacket pocket. (Id.). At that point, Edge told Eastep he "had to come with him," (id. ¶ 23), and asked Eastep if he had anything that could poke or harm him, and, if so, to turn it over. (Id.). Complying, Eastep produced a box cutter knife. Upon seeing the knife, Edge "panicked, pulled his service weapon and pointed it at Landon Eastep." (Id.). As alleged in the Second Amended Complaint, "[t]his overreaction on the part of Trooper Edge set forth a calamitous chain of events." (Id.).

Fabjan Llukaj, an off-duty Mt. Juliet Police Department officer, stopped to assist Edge. (Id. ¶ 24). Llukaj, while wearing civilian clothes and approaching Eastep from behind, pointed his pistol at Eastep and began issuing a series of profanity-laden commands. (Id.). Shortly thereafter, Metropolitan Nashville Police officers Brian Murphy, Steven Carrick, Edin Plancic, Sean Williams, Justin Pinkelton, and James Kidd, as well as Tennessee Highway Patrol officer Charles Achinger arrived to provide backup support. (Id.).

Over the course of the next 30 to 35 minutes, these named officers ("Individual Defendants") and others worked to convince Eastep to surrender and continued to call additional backup officers to the scene. (Id. ¶¶ 25–26). "[T]hree additional, heavily armed military-styled officers carrying long guns joined." (Id. ¶ 26). Eastep, facing a wall of officers, reached for his vape in his jacket pocket. (Id.). The Second Amended Complaint alleges that, at this moment, "every police officer and state trooper on the scene simultaneously opened fire on Mr. Eastep, killing him." (Id.).

According to the Tennessee Bureau of Investigation's report, 25 nine-millimeter cartridges and eight rifle cartridges were recovered at the scene. (Id. ¶ 27). Edge fired his service weapon approximately seven or eight times. (Id. ¶ 28). Williams fired his service weapon five times. (Id. ¶ 33). Kidd fired his service weapon four times. (Id. ¶ 34). Pinkelton fired his service weapon three times. (Id. ¶ 31). Achinger and Carrick each fired their service weapon twice. (Id. ¶¶ 29, 32). Llukaj fired his service weapon once. (Id. ¶ 30). Plancic fired his personal BCM AR15 rifle six times, (Id. ¶ 35), and Murphy fired his personal Colt rifle twice. (Id. ¶ 36). Murphy fired his two shots after Eastep had both been struck multiple times and fallen to the ground. (Id. ¶ 27). Prior to Murphy pulling the trigger of his personally-owned rifle, another officer had clearly yelled, "Cease fire." (Id.).

An autopsy report revealed that Eastep suffered twelve bullet wounds from his shoulders down to his left leg. (Id. ¶ 38). The bullets fractured numerous bones and two vertebrae, and struck his lungs, heart, and aorta. (Id.). Notably, only four bullets entered the front of his body, while five bullets entered through his back—meaning that they struck him after he had fallen to the ground. (Id.).

3

On September 15, 2022, Plaintiff filed this suit. (Doc. No. 1). In the operative Second Amended Complaint, Plaintiff alleges two claims against the Individual Defendants actionable under 42 U.S.C. § 1983 ("§ 1983"). (Doc. No. 72 ¶¶ 49–65). The first alleges that by shooting Eastep, the Individual Defendants violated the Fourth Amendment's bar against excessive force, (id. ¶ 51), and the second alleges that the Individual Defendants are liable for the excessive force of others on the scene because they failed to intervene and protect Eastep (id. ¶¶ 58–65). The Second Amended Complaint also brings claims under § 1983 against Metro and a Tennessee state law negligence claim against both Metro and Mt. Juliet. (Doc. No. 72 ¶¶ 66–91).

With respect to the § 1983 claims, the Individual Defendants contend that they are entitled to qualified immunity, (Doc. Nos. 104 at 8–16; 108 at 8–14; 112 at 7–15), while Metro argues that Plaintiff has failed to plead essential elements of each claim. (Doc. No. 106 at 5–16). Metro and Mt. Juliet assert Tennessee's state sovereign immunity bars Plaintiff's state law negligence claim. (Doc. Nos. 106 at 16–19; 110 at 5–9). Separately, the Metro Officers request this Court dismiss all claims against Carrick and Williams pursuant to Federal Rules of Civil Procedure 12(b)(5) and 4(m). (Doc. No. 104 at 17–19).

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020). In determining whether a complaint meets this standard, the Court must accept all the factual allegations as true, draw all reasonable inferences in the plaintiffs' favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018). Accordingly, the complaint must "contain either direct or inferential

4

allegations respecting all material elements to sustain a recovery under some viable legal theory." Eidson v. Tenn. Dep't of Child.'s Servs., 510 F.3d 631, 634 (6th Cir. 2007) (citing Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005)). The Court will not accept a legal conclusion masked as a factual allegation, nor an "unwarranted factual inference," as true. Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007).

Federal Rule of Civil Procedure 12(b)(5) authorizes courts to dismiss a complaint for insufficient service of process, including for failure to comply with the service requirements of Federal Rule of Civil Procedure 4. Fed. R. Civ. P. 12(b)(5). Federal Rule of Civil Procedure 4(m) provides that "[i]f a defendant is not served within 90 days after the complaint is filed, the Court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against the defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). The Court must extend the time for service upon a showing of good cause, and the Court may exercise its discretion to permit late service even where a plaintiff has not shown good cause. United States v. Oakland Physicians' Med. Ctr., LLC, 44 F.4th 565, 568 (6th Cir. 2022) (first citing Fed. R. Civ. P. 4(m); and then citing Henderson v. United States, 517 U.S. 654, 662 (1996)). Otherwise, the language of Rule 4(m) mandates dismissal, either on motion or sua sponte. Fed. R. Civ. P. 4(m); see also Byrd v. Stone, 94 F.3d 217, 219 (6th Cir. 1996).

**ANALYSIS**

I. **Claims against the Individual Defendants**

Qualified immunity protects governmental officials from suit as long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A two-step inquiry applies. The first question is "whether the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right[.]" Mullings v. Cyranek, 805

5

F.3d 760, 765 (6th Cir. 2015). The Court then asks whether the right was "clearly established" such "that a reasonable official would understand that what he is doing violates that right." Saucier v. Katz, 533 U.S. 194, 201–02 (2001) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). District courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Although a defendant's "entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgement and not dismissal under Rule 12." Wesley v. Campbell, 779 F.3d 421, 433–34 (6th Cir. 2015) (alteration in original) (quotation marks and citations omitted). "The reasoning for [this] preference is straightforward: 'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." Guertin v. State, 912 F.3d 907, 917 (6th Cir. 2019) (citation omitted). Therefore, it is generally inappropriate for a district court to grant a 12(c) motion based on qualified immunity. Wesley, 779 F.3d at 443.

However, at the motion to dismiss in a qualified immunity case, the Court may consider clear video footage which "'blatantly contradicts' or 'utterly discredits'" the plaintiff's version of events because such evidence renders the allegations of the complaint implausible and unable to be taken as true. Bell v. City of Southfield, Mich., 37 F.4th 362, 364 (6th Cir. 2022) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)); see also Bailey v. City of Ann Arbor, 860 F.3d 382, 387 (6th Cir. 2017) ("The video "utterly discredit[s]" Bailey's version of events and allows us to ignore the "visible fiction" in his complaint. If Bailey's pleadings internally contradict verifiable facts central

6

to his claims, that makes his allegations implausible. That's why our sister courts have considered videos when granting motions to dismiss. And that's why we do so here."). Plaintiff and Defendants have submitted video evidence to either to support or discredit the allegations in the Second Amended Complaint (Plaintiff's Manually Filed Ex. 1; Defendants' Manually Filed Ex. 1; Defendants' Manually Filed Ex. 2; Defendants' Manually Filed Ex. 3; Defendants' Manually Filed Ex. 4). The Court has reviewed these videos and finds that they blatantly contradict Plaintiff's allegation about the moments before the Individual Defendants opened fire on Eastep. Bailey, 860 F.3d at 386. They also provide context absent from the Second Amended Complaint that is dispositive of Plaintiff's failure to protect claim.

Specifically, the video evidence unequivocally shows Eastep withdrawing an object from his pocket, raising it in front of him to about shoulder height, and pointing it towards law enforcement. (Plaintiff's Manually Filed Ex. 1 at 00:58–00:59; Defendants' Manually Filed Ex. 1 at 42:48–42:49; Defendants' Manually Filed Ex. 2 at 27:49–27:50; Defendants' Manually Filed Ex. 3 at 27:12–13). Only then was Eastep met with a hail of bullets by police officers. (Plaintiff's Manually Filed Ex. 1 at 00:59–01:04; Defendants' Manually Filed Ex. 1 at 42:49–42:54; Defendants' Manually Filed Ex. 2 at 27:50–27:55; Defendants' Manually Filed Ex. 3 at 27:13–18). In total, the gunfire lasted roughly five seconds. (Id.; see also Defendants' Manually Filed Ex. 4 at 00:54–00:59). However, before it ceased, Eastep was clearly struck and had fallen to the ground. (Id.).

With these additional facts in mind, the Court will consider the Individual Defendants' qualified immunity defense.

## A. Excessive Force

"[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 11 (1985). The use of deadly force is excessive and unreasonable unless there is probable cause to believe that the suspect poses an immediate threat to the officer or to others. Kilnapp v. City of Cleveland, 2023 WL 4678994, at *4 (6th Cir. July 21, 2023) (citing Garner, 471 U.S. at 11; Graham v. Connor, 490 U.S. 386, 396 (1989)). The officers' use of deadly force is also examined for objective reasonableness, using the Graham factors. Graham, 490 U.S. at 396. "However, the threat of immediate harm is a 'minimum requirement for the use of deadly force.'" Puskas v. Delaware Cnty., Ohio, 56 F.4th 1088, 1096 (6th Cir. 2023) (citation omitted). At the same time, the Sixth Circuit has "held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." Hood v. City of Columbus, Ohio, 827 Fed. App'x 464, 470 (6th Cir. 2020) (citing Baker v. City of Hamilton, 471 F.3d 601, 607 (2006)).

The Individual Defendants contend the video evidence, which clearly shows Eastep raising his arm towards some of the officers with an object his in hand, demonstrates that they were entitled to use deadly force. (Doc. Nos. 104 at 8–13; 108 at 8–12; 112 at 7–10). Plaintiff responds that "[s]hooting at Landon Eastep 33 times with 12 bullets hitting him, with at least 5 of the bullets entering his back, including Officer Murphy's final 2 shots fired after he hit the ground, amounts to an unreasonable and excessive use of force." (Doc. No. 122 at 16; 126 at 23; 130 at 16). As alleged and as the video evidence confirms, certain Individual Defendants continued to shoot during and after he fell to the ground. (See e.g., Doc. No. 72 ¶ 36 ("The final two (2) shots were fired by Defendant Murphy as Mr. Eastep had been shot multiple times and had fallen to the ground, was clearly incapacitated and subdued."); see also id. ¶ 38 ("Four (4) of the bullets that

8

Case 3:22-cv-00721   Document 149   Filed 03/29/24   Page 8 of 19 PageID #: 1032

struck him traveled front to back, while five (5) entered through his back. When he was initially struck by gunfire, Mr. Eastep fell to the ground, landing on his side with his back towards some of the officers.")).

The Sixth Circuit has explained, "[e]ven if it was reasonable for the Officers to open fire . . . that does not automatically clear the entire encounter of the Constitution's prohibition against excessive use of force." Hood, 827 Fed. App'x at 469. And "[w]hen more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." Smith v. City of Troy, 874 F.3d 938, 944 (6th Cir. 2017). Thus, the Court must assess, for each of the nine Individual Defendants, his initial decision to shoot and any subsequent decisions to keep shooting. Id. at 470 (quoting Dickerson v. McClellan, 101 F.3d 1151, 1162 n.9 (6th Cir. 1996)).

Even with the benefit of the record video evidence, the Court cannot discern exactly when each Individual Defendant, with the exception of Murphy, discharged his weapon. The Court has not been provided with body camera footage from each Individual Defendant. As such, it can only guess which gun shots belonged to each Individual Defendant. And, even with respect to the Individual Defendants whose body camera footage is in the record, with the exception of Murphy, it is impossible to determine conclusively which sounds and movements are attributable to that officer's weapon and which are attributable to the gunfire of others. (Defendants' Manually Filed Ex. 2 at 27:50–27:55; Defendants' Manually Filed Ex. 3 at 27:13–18; Defendants' Manually Filed Ex. 4 at 00:58–00:59). It may very well be that one or all of the Individual Defendant fired an opening salvo, had a moment to reassess the situation, and fired again when Eastep was incapacitated. Likewise, it is plausible that an Individual Defendant did not discharge his weapon

9

until after the conclusion of any threat warranting deadly force.[1] Without additional factual information or evidence, the Court cannot identify the subset, if one exists, of the Individual Defendants who, as a matter of law, exercised the required restraint. At a minimum, at this early stage in litigation, the Second Amended Complaint's allegations "plausibly give rise to an entitlement to relief." Baum, 903 F.3d at 581.

Moving to step two of the qualified immunity analysis, "a legal principle must have a sufficiently clear foundation in then-existing precedent," to be clearly established. District of Columbia v. Wesby, 538 U.S. 48, 63 (2018). There does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011). To this end, Plaintiff invokes Russo v. City of Cincinnati, 953 F.2d 1045 (6th Cir. 1992). (Doc. Nos. 122 at 14; 126 at 22; 130 at 14). There, the Sixth Circuit held "that a reasonable jury could find that the officers violated the suspect's constitutional rights with the use of deadly force when they repeatedly shot at the suspect, even after he dropped his weapon and posed no serious threat of harm." Hood, 847 Fed. App'x at 470 (describing the holding in Russo). Although, as the Individual Defendants point out, the time between the officers' uses of deadly force in Russo were far longer than possible in this case, the Sixth Circuit in Hood applied Russo to circumstances nearly identical to those before the Court now, where police shot a suspect who possessed a firearm as he was "down on the ground or in the process of going down," and held that the officers were not entitled to qualified immunity at summary judgment. See Hood, 827 Fed. App'x at 471–72. Granting every reasonable inference

---

[1] Indeed, the video evidence clearly establishes Murphy did not load his rifle onto his shoulder until Eastep had fallen. (See e.g., Defendants' Manually Filed Ex. 1 at 42:48–42:50).

in Plaintiff's favor, this Court cannot say that the Individual Defendants lacked "fair warning" that shooting Eastep when he did not pose a safety threat is unconstitutional. Id. at 472.

Rather than allow discovery to proceed and address their qualified immunity defense at summary judgment, the Individual Defendants ask for the Court to collapse the officer- and segment-specific inquiry and apply a blanket-version of qualified immunity. That is not the law. The Second Amended Complaint has alleged the plausible use of excessive force, and the video evidence is not dispositive on this issue. Affording Plaintiff every reasonable inference, qualified immunity does not attach. As such, further factual development is necessary to properly consider the Individual Defendants' qualified immunity defense, Wesley, 779 F.3d at 433–34, and the Court will reserve its decision on the matter until that time.

### B. Failure to Protect

"Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997) (citation omitted). Even assuming *arguendo* that at least one of the Individual Defendants used excessive force against Eastep, the Court cannot allow this claim to proceed. The Second Amended Complaint's failure to plausibly allege the second element in the face of uncontroverted video evidence is fatal to this claim.

The Sixth Circuit has repeatedly made clear that in instances where excessive force lasts only a matter of seconds, officers have no realistic opportunity to intercede and therefore cannot be held liable for failing to prevent another officer's unconstitutional use of excessive force. For instance, in Amerson v. Waterford Township, the Sixth Circuit held that an officer did not have a

11

Case 3:22-cv-00721    Document 149    Filed 03/29/24    Page 11 of 19 PageID #: 1035

duty or means to intervene "given that the alleged events took place quickly and without any forewarning," and when the time to intervene "could not have been more than a few seconds." 562 Fed. App'x 484, 490 (6th Cir. 2014). Likewise, in Burgess v. Fischer, the panel affirmed the lower court's decision to dismiss a failure to protect claim because the plaintiff-appellees did not suggest that the defendants had reason to anticipate the use of force or that that force lasted any more than ten seconds. 735 F.3d 462, 476 (6th Cir. 2013).

The Second Amended Complaint alleges that "[t]here was sufficient time during the incident described to stop the other [I]ndividual Defendants from the continued use of excessive force." (Doc. No. 72 ¶ 60). The incontrovertible video evidence, however, proves this flatly wrong. Between the time Eastep begins to raise his arm and when the last shot is fired, only six seconds elapse. (Plaintiff's Manually Filed Ex. 1 at 00:58–1:04; Defendants' Manually Filed Ex. 1 at 42:48–42:54; Defendants' Manually Filed Ex. 2 at 27:50–27:55; Defendants' Manually Filed Ex. 3 at 27:12–18). In that time, the Individual Defendants would have had to recognize that other Individual Defendants intended to apply excessive force by shooting Eastep, realize he did not present a threat warranting deadly force, and step in to thwart their efforts. The Second Amended Complaint alleges no facts suggesting that any Individual Defendants could accomplish this seemingly impossible feat. (See generally Doc. No. 72).

Perhaps for that reason, Plaintiff argues that Edge and Llukaj's failure to protect Eastep occurred in the thirty or more minutes before Eastep raised his arm. (See Doc. No. 126 at 25 ("Trooper Edge had a duty [to] protect Mr. Eastep from not only his actions but the actions of other responding officers. . . . Once other officers arrived and provided sufficient coverage of Mr. Eastep, Trooper Edge had a duty to withdraw from the firing line and report his knowledge of the initial encounter to other officers."); see Doc. No. 130 at 17–18 ("Llukaj knew, or should have

12

known through reasonable communication with Trooper Edge during the [35] minute encounter, that Landon Eastep did not have a firearm, had a vape in his pocket, was clearly scared, perhaps mentally ill, or any other possible scenario which would obviate the need for the continued increase of more officers with tactical weaponry approaching and encircling Mr. Eastep. Finally, Fabjan Llukaj should have been properly equipped with less lethal devices and should have only inserted himself into the situation if he was properly trained. Additionally, Fabjan Llukaj should not have subverted other officers, who were more appropriately trained and equipped, from assuming direct contact with Eastep.")). Setting aside that there is no allegation in the Second Amended Complaint that Edge knew Eastep did not have a gun, (see generally Doc. No. 72), Plaintiff's argument fails to connect these supposed missteps to the essential elements of her failure to protect claim. At bottom, Plaintiff offers no plausible allegation or explanation that either Edge or Llukaj observed or had reason to know that excessive force would be used at any point during their ongoing negotiations with him.

Precedent and the circumstances of this case show that the Individual Defendants did not have a duty or means to intervene in others' alleged use of excessive force. Accordingly, no plausible constitutional violation occurred, and the Individual Defendants are entitled to qualified immunity as to this claim.

## II. Claims Against Metro and Mt. Juliet

The Court will address the claims specific to Metro first and then turn to the claim brought against both municipalities.

### A. Section 1983 Claims Against Metro

A municipality cannot claim qualified immunity. Meals v. City of Memphis, Tenn., 493 F.3d 720, 727 (6th Cir. 2007) (citing Owen v. City of Independence, 445 U.S. 622, 650 (1980));

13

Ruby v. Horner, F. App'x 284, 285 (6th Cir. 2002). At the same time, "a municipality cannot be held liable solely because it employs a tortfeasor[.]" Monell v. Dep't of Social Servs. of N.Y., 436 U.S. 658, 691 (1978). Thus, "under [Section] 1983, local governments are responsible only for 'their own illegal acts.' . . . They are not vicariously liable under [Section] 1983 for their employees' actions." Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)). Therefore, a municipality may be held liable under Section 1983 if the challenged conduct occurs pursuant to "a municipality's 'official policy,' such that the municipality's promulgation or adoption of the policy can be said to have 'caused[d]' one of its employees to violate that plaintiff's constitutional rights." D'ambrosio v. Marino, 747 F.3d 378, 386 (6th Cir. 2014) (quoting Monell, 436 U.S. at 692). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61.

To state a municipal liability claim, a plaintiff must adequately allege either: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance of or acquiescence to federal rights violations." Brugess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013); accord Boulton v. Swanson, 795 F.3d 526, 531 (6th Cir. 2019). Plaintiff attempts to establish municipal liability under the first, third, and fourth methods. (Doc. No. 72 ¶¶ 66–87). Because the Second Amended Complaint alleges that Metro's liability is born from its deliberate indifference to the potential of unconstitutional conduct on the part of its officers, (see id. ¶¶ 68–70, 72–73, 82), Court will address these claims together.

To successfully allege a theory of municipal liability based on deliberate indifference to an unconstitutional policy or custom, a plaintiff bears the burden of showing (1) "that an unconstitutional policy or custom existed, [(2)] that the policy or custom was connected to the municipality, and [(3)] that the policy or custom caused the constitutional violation." Spainhoward v. White Cnty., Tenn., 421 F. Supp. 3d 524, 542–43 (M.D. Tenn. 2019) (citation omitted). As alleged in the Second Amended Complaint, the Metropolitan Nashville Police Department maintained policies or customs of—or acquiesced to such customs or practices of—failing to (1) provide for the safety of arrestees, detainees, and the like from the use of excessive force, (Doc. No. 72 ¶ 68); (2) follow procedures that de-escalate and avoid the use of excessive force when dealing with citizens with a history of mental illness, (id. ¶ 69); and (3) condemn officers turning a blind eye to excessive force, (id. ¶ 72). Such policies or customs must be shown by an alleged "clear and persistent pattern." Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005); Okolo v. Metro. Gov't of Nashville, 892 F. Supp. 2d 931, 941–42 (M.D. Tenn. 2012).

Similarly, to adequately allege a custom of inaction towards constitutional violations, a plaintiff must allege facts making plausible "(1) a "clear and persistent pattern" of misconduct, (2) notice or constructive notice on the part of the municipality, (3) the defendant's tacit approval of the misconduct, and (4) a direct causal link to the violations." Nouri v. City of Oakland, Mich., 615 F. App'x 291, 296 (6th Cir. 2015); see also Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir. 2005); Okolo, 892 F. Supp. 2d at 941–42.

As for the theory of municipal liability based on a failure to properly train or supervise police offices, "a plaintiff may show prior instances of unconstitutional conduct by demonstrating that a governmental entity ignored a history of abuse and was clearly on notice that the training in a particular area was deficient and likely to cause injury." Spainhoward, 421 F. Supp. 3d at 543

(citing Slusher v. Carson, 540 F.3d 449, 457 (6th Cir. 2008); Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005)).[2]  Again, these prior instances must amount to an alleged "pattern of past misconduct."  Id.

The Second Amended Complaint alleges instances of Metro's officers using excessive force in order to demonstrate the patten necessary under each of the three theories of municipal liability.  (Doc. No. 72 ¶¶ 43–48).  Some predate the events underlying this case by a decade or more (see e.g., id. ¶¶ 43, 44 (citing incidents from 1998 and 2005)), and another does not concern Metropolitan Nashville Police Department officers.  (Id. ¶ 48 (concerning alleged excessive force by employees of the Davidson County Sheriffs' Office)).  Notwithstanding these and Metro's several other objections to the use of these prior incidents, (Doc. No. 106 at 8–12, 14), Metro contends that the Second Amended Complaint lacks plausible allegations supporting the other essential elements of Plaintiff's claims, (id. at 6–8, 14–16).  Indeed, according to Metro, the paragraphs supposedly supporting Plaintiff's municipal liability claims "are legal conclusions dressed up as facts."  (Id. at 7; see also id. at 14 (characterizing the allegations as a "formulaic recitation of the elements of the cause of action")).

Plaintiff offers an excuse rather than a responsive argument.  After reaffirming her position that the Individual Defendants exercised excessive force, Plaintiff states in full:

> This case has been stayed and discovery has not yet commenced.  As alleged in the Second Amended Complaint, Metro has notice of prior incidents of excessive force and has failed to comply with appropriate de-escalation tactics.  Once discovery

---

[2] Although a municipality may also be held liable only where there is essentially complete failure to train the police force or training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would properly be characterized as substantially certain to result.  Id. (citing Hays v. Jefferson Cnty., Ky., 668 F.2d 869, 874 (6th Cir. 1982)).  The Second Amended Complaint's failure-to-train allegations do not allege the "single incident" theory in an adequate or even conclusory manner.  (See Doc. No. 72 ¶ 82 (alleging that the deprivation of constitutional rights was only "likely" to result)).  Thus, the Court need not consider this alternative theory.

> proceeds, the Plaintiff anticipates Metro's failure to train or modify its training regarding the use of force and de-escalating situations with emotionally stressed individuals, as alleged, to be more thoroughly established by the use of extrinsic evidence obtained through discovery. These are issues that are routinely addressed at the summary judgment stage or at trial once discovery is complete and the strength of the Plaintiff's proof and evidence can be presented and considered.

(Doc. No. 124 at 11). Nowhere in this explanation does Plaintiff gesture at—let alone argue that the Second Amended Complaint adequately alleges—the other essential elements required of the three relevant theories of municipal liability. (Id.). Accordingly, Plaintiff has abandoned her § 1983 claims against Metro. ARJN #3 v. Cooper, 517 F. Supp. 3d 732, 750 (M.D. Tenn. 2021) ("Where a party fails to respond to an argument in a motion to dismiss the Court assumes [s]he concedes this point and abandons the claim" (internal quotation marks and citation omitted)).

### B. Negligence Claim Against Metro and Mt. Juliet

Although, as previously stated, "a municipality cannot be held liable solely because it employs a tortfeasor," Monell, 436 U.S. at 691, Tennessee, through the Tennessee Governmental Tort Liability Act ("TGTLA"), Tenn. Code Ann. § 29-20-101 *et seq.*, removed its immunity for "injury proximately caused by a negligent act or omission of any employee within the scope of his employment" but provides a list of exceptions to this waiver of immunity. Tenn. Code Ann. § 29-20-205. Injuries that "arise[ ] out of . . . civil rights" are one such exception, that is, sovereign immunity continues to apply in those circumstances. Id. "TGTLA's 'civil rights' exception has been construed to include claims arising under 42 U.S.C. § 1983 and the United States Constitution." Johnson v. City of Memphis, 617 F.3d 864, 872 (6th Cir. 2010).

Metro and Mt. Juliet contend that Tennessee's sovereign immunity has not been waived because the negligent act alleged was the shooting underlying Plaintiff's excessive force claim against the Individual Defendants. (Doc. Nos. 106 at 17–18; 110 at 6). In response, Plaintiff asserts that "the poor planning, bad tactics or negligence of [Metro and Mt. Juliet's officers] should

17

be actionable" because "the negligence of the officers that might have created the circumstances that led to the use of force is not . . . considered in an excessive force case." (Doc. No. 124 at 13; see also Doc. No. 128 at 9 (same)).

But Plaintiff's negligence claim, as pleaded in the Second Amended Complaint, does not focus on the several minutes between Edge's initial contact with Eastep and when Eastep raised his electronic cigarette towards the line of officers. The negligent act identified is the "use of excessive force by shooting." (Doc. No. 72 ¶ 91). Because the circumstances giving rise to these claims are the same alleged wrongful acts that give rise to Plaintiff's excessive force claim, Metro and Mr. Juliet retain their immunity. See Grove v. Metro. Gov't of Nashville & Davidson Cnty., No. 3:18-cv-01270, 2019 WL 2269884, at *7 (M.D. Tenn. May 28, 2019) (collecting cases). Plaintiff cannot save her claim by amending the pleadings in a response. Waskul v. Washtenaw Cnty. Cmty. Mental Health, 979 F.3d 426, 440 (6th Cir. 2020) (explaining that a plaintiff "cannot amend their complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint."); Bates v. Green Farms Condo. Ass'n, 958 F.3d 470, 483 (6th Cir. 2020) (same).

### III. Metro Officers Carrick and Williams Rule 12(b)(5) Request

At the end of Metro Officers' Motion, Carrick and Williams ask the Court to dismiss without prejudice all claims against them pursuant to Rules 12(b)(5) and 4(m) for lack of good cause for an extension. (Doc. No. 103 at 2–4; see also Doc. No. 104 at 17–19 (arguing in support of same)). Specifically, they argue that dismissal is warranted because Plaintiff failed to perfect service or to request that Metro Officers' counsel accept service of process for Carrick and Williams until 174 days after she filed her initial complaint. (Doc. No. 104 at 18). Plaintiff does not deny this timeline or contend that good cause exists. (Doc. No. 122 at 16). Instead, she asserts

the Court should grant an extension because Metro Officers' counsel agreed to accept service on behalf of Carrick and Williams and an extension would promote judicial efficiency. (Id.).

The Sixth Circuit has directed district courts to consider seven factors in "deciding whether to grant a discretionary extension of time in the absence of a finding of good cause." Oakland Physicians Med. Ctr., LLC, 44 F.4th at 569. Those factors are:

> (1) whether an extension of time would be well beyond the timely service of process; (2) whether an extension of time would prejudice the defendant other than the inherent prejudice in having to defend the suit; (3) whether the defendant had actual notice of the lawsuit; (4) whether the court's refusal to extend time for service substantially prejudice the plaintiff, i.e., would the plaintiff's lawsuit be time-barred; (5) whether the plaintiff had made good faith efforts to effect proper service of process or was diligent in correcting any deficiencies; (6) whether the plaintiff is a pro se litigant deserving of additional latitude to correct defects in service of process; and (7) whether any equitable factors exist that might be relevant to the unique circumstances of this case.

(Id.). No party addresses these seven facts. (See generally Doc. Nos. 103, 104, 122). However, based on the record, factors one, four, and six support granting Carrick and Williams' request, whereas factors two, three, and four support permitting an extension. In light of its "strong preference" for resolving claims on their merits, United States v. $22,050.00 U.S. Currency, 595 F.3d 318, 322 (6th Cir. 2010), the Court will, in its discretion, grant the extension.

## CONCLUSION

For the forgoing reasons, the Court will grant Metro and Mt. Juliet's Motions to Dismiss (Doc. Nos. 105, 107) and grant in part and deny in part Metro Officers', THP Officers', and Llukaj's Motions to Dismiss (Doc. Nos. 103, 107, 111).

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

19

Case 3:22-cv-00721    Document 149    Filed 03/29/24    Page 19 of 19 PageID #: 1043